***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence. The Full Commission adopts the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act. *Page 2 
2. An employment relationship existed between plaintiff-employee and defendant-employer on March 27, 2006.
3. On March 27, 2006, plaintiff suffered an injury by accident to his right thumb arising out of and in the course and scope of his employment.
4. On March 27, 2006, American Home Assurance Company was the insurer on the risk for Bridger Drilling Enterprises and AIG Domestic Claims, Inc. is the servicing agent for American Home Assurance Company.
5. Plaintiff's average weekly wage was $710.01, which yields a compensation rate of $473.36.
6. The parties stipulated to the admissibility of 138 pages of exhibits consisting of Industrial Commission filings, proposed Forms 21 and 25A and plaintiff's medical records labeled Stipulated Exhibit A.
7. Plaintiff's Exhibits one (1) through four (4) and seven (7) through nine (9), having been stipulated as admissible by the defendants are hereby deemed admissible.
8. Plaintiff's Exhibits five (5) and six (6) and the testimony referring to the same, were objected to by defendants as hearsay at the hearing before the deputy commissoner. Defendants objections were overruled by the deputy commissioner and the same were received as evidence.
 ***********
As set forth in the Pre-Trial Agreement and this Opinion and Award, the Commission addresses the following: *Page 3 
 ISSUE
1. Whether Plaintiff is entitled to a ten percent (10%) increase in his compensation pursuant to N.C. Gen. Stat. § 97-12?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born on June 28, 1952. He has a high school education and additional community college training in welding, masonry, bricklaying, and some management training. Most of his work experience has been in physical labor.
2. On March 27, 2006, plaintiff suffered an admittedly compensable injury by accident to his right thumb. While he was operating a CME-45 drill rig, his right thumb was caught in part of the equipment, a quarter-inch wire cable, which got caught in the spinning drill rod, pulling plaintiff against the machine and causing an amputation of plaintiff's right thumb. Plaintiff was unable to shut down the machine because the shut off or kill switches near him were non-operational.
3. Plaintiff yelled for his coworker Winston Flynt to shut down the machine. Mr. Flynt was able to shut off the drill rig by turning off the ignition key. Mr. Flynt located and retrieved plaintiff's severed thumb and put it in a jar of ice. An ambulance was called and plaintiff's thumb was later surgically reattached by Dr. Lawrence Scott Levin at Duke University Medical Center.
4. The drill rig that plaintiff was operating has five shut off or kill switches designed to immediately cut the power and shut down the rig as set forth in the operating manual. On the *Page 4 
date of the accident, the drill rig had two operating and three non-operating shut off switches. The left side wobble switch was working, and the rig could be shut down using the ignition key. The right side wobble switch and the push-pull switch near plaintiff were not working.
5. On January 2, 2007, Richard Teachey, a safety and health compliance officer with the N.C. Department of Labor conducted an inspection. Mr. Teachey noted violations of the Occupational Safety and Health Act of North Carolina (OSHA). In particular, he found that three of the five emergency shut off switches were non-operating. Defendant-employer was cited and fined for OSHA violations.
6. Prior to the accident, plaintiff had advised George Bridger, the President of Bridger Drilling, that the shut off switches were not working and needed repairs. Plaintiff had secured quotes for replacement parts, but had not been given authority to purchase the parts or make the needed repairs. Defendant-employer had actual notice of the defective and non-operating switches. When Mr. Teachey conducted his inspection, Mr. Bridger admitted to him that three of the shut off switches were not working and told Mr. Teachey that he only needed two operating shut off switches to shut the rig down. Mr. Bridger's testimony to the contrary is deemed not credible and given less weight than that of Mr. Teachey.
7. If the push-pull switch that was near plaintiff or the right side wobble switch were operational at the time of plaintiff's accident, plaintiff would have been able to shut off the machine when he was entrapped in the wire in time to prevent the amputation of his thumb.
8. Plaintiff underwent a Functional Capacity Evaluation (FCE) on July 10, 2007 at the request of Dr. Lawrence S. Levin, his treating surgeon. Plaintiff participated in the FCE for three hours and showed full and consistent physical effort. The FCE showed that plaintiff is capable of working in the low medium workload with lifting up to 25 to 35 pounds on an *Page 5 
occasional basis and 25 pounds more frequently. Carrying and lifting tasks with his right hand should be limited to predictable circumstances, and lifting should be limited to knee to shoulder level. Plaintiff cannot carry out overhead repetitive lifting or work with a sustained hold. He should not use tools that vibrate or have unexpected movements with his right hand.
9. As of December 11, 2007, Dr. Levin wrote in a letter to the carrier that plaintiff had reached maximum medical improvement, but did not assign a permanent partial disability (PPD) rating. He indicated that plaintiff could not return to his prior work or perform repetitive tasks and that plaintiff would need vocational assistance.
10. On January 10, 2008, Dr. Levin assessed plaintiff with a PPD rating of forty percent to the right hand. As of the date of plaintiff's PPD rating, plaintiff required vocational rehabilitation counseling to identify a new occupation and to assist in receiving training for said occupation. Dr. Levin also noted that although plaintiff suffered a severe injury to his hand, plaintiff was motivated to work.
11. As a consequence of the amputation and reattachment of his right thumb, plaintiff is unable to return to his prior employment as a drill rig operator. Due to his forty percent impairment to his hand, as noted by Dr. Levin, plaintiff will be restricted from much of the physical labor he has done in the past.
12. Plaintiff is in need of and is interested in further vocational training to equip him to return to work, for which he has requested that defendants provide such assistance. Plaintiff is well suited for retraining and vocational assistance which help to lessen any disability which plaintiff may have.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following: *Page 6 
 CONCLUSIONS OF LAW
1. Defendant-employer was under a statutory duty to ensure that all shut off or kill switches on the drill rig operated by plaintiff were in place and operational. The provisions of N.C. Gen. Stat. § 95-129(1) provide that "each employer shall furnish to each of his employees conditions of employment and a place of employment free from recognized hazards that are causing or are likely to cause death or serious injury or serious physical harm to his employees." As set forth in the OSHA report, the failure of the defendant-employer to maintain the rig with the shut down switches in an operational condition is a recognized hazard. For that reason, defendant-employer was in violation of its statutory duty.
2. Prior to the accident, defendant-employer had actual knowledge of the non-operating shut off switches and had failed to take any steps to repair the switches, in violation of the drill rigs operational manual and N.C. Gen. Stat. § 95-129(1). N.C. Gen. Stat. § 97-12.
3. Defendant-employer's willing failure to comply with statutory safety requirements was the proximate cause of plaintiff's thumb amputation and a ten percent increase in compensation should be awarded to plaintiff pursuant to N.C. Gen. Stat. § 97-12.
4. As of December 11, 2007, plaintiff's right hand condition has reached maximum medical improvement. See Knight v. Wal-Mart Stores,Inc., 149 N.C. 1, 562 S.E.2d 620 (2003). Plaintiff has sustained a forty percent permanent partial impairment to his right hand, for which he is entitled to compensation for 80 weeks at the rate of $473.36 per week, a total of $37,868.80, plus ten percent penalty of $3,786.88. N.C. Gen. Stat. §§ 97-31(12); 97-12.
5. A finding that plaintiff has reached maximum medical improvement is not the equivalent of finding that the employee has pre-injury wage earning capacity. Sussos v. Wheaton Indus., 145 N.C. App. 164,551 S.E.2d 456, disc. review denied, 355 N.C. 214, 560 S.E.2d 135 *Page 7 
(2002). Plaintiff has not yet regained his pre-employment wage earning capacity and as such is entitled to ongoing temporary total disability (TTD) at the rate of $473.36 per week, plus a ten percent penalty of $47.33, for a total of $520.69 per week, until such time as he returns to work or until further Order of the Commission. N.C. Gen. Stat. §§ 97-29; 97-12.
6. At the end of the healing period, plaintiff is entitled to receive compensation for total or partial disability under N.C. Gen. Stat. §§ 97-29
or 97-30 or compensation for permanent partial disability under N.C. Gen. Stat. § 97-31, but not both. Collins v. Speedway Motorsports Corp.,165 N.C. App. 113, 598 S.E.2d 185 (2004). Therefore, plaintiff may elect to receive the more favorable remedy between ongoing benefits for temporary total disability provided by N.C. Gen. Stat. § 97-29 until such time as he is capable of returning to work at his pre-injury wage or his scheduled benefit of 80 weeks of compensation to be awarded pursuant to N.C. Gen. Stat. § 97-31(12). See Cockman v. PPG Indus., 84 N.C. App. 101,351 S.E.2d 771 (1987). Defendants are entitled to a credit against any permanent partial disability due for all temporary total disability benefits paid after plaintiff reached maximum medical improvement on December 11, 2007. Collins v. Speedway Motor Sports Corp.,165 N.C. App. 113, 598 S.E.2d 185 (2004); Arnold v. Wal-Mart,154 N.C. App. 482, 571 S.E.2d 888 (2002).
7. Plaintiff's treating physician has recommended and plaintiff is entitled to receive reasonable vocational assistance and retraining to be provided by Defendants. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD *Page 8 
1. Plaintiff's claim for a ten percent increase in compensation pursuant to N.C. Gen. Stat. § 97-12 is hereby GRANTED. Defendants shall pay an additional ten percent (10%) of the compensation otherwise due and paid or payable to plaintiff. All amounts accrued shall be paid in a lump sum.
2. Defendants shall provide plaintiff with reasonable vocational assistance and training and further education as may be reasonably needed to prepare him to return to gainful employment as close as possible to his pre-injury wage.
3. Defendants shall pay ongoing TTD at the rate of $473.36 per week, plus a ten percent penalty of $47.33, for a total of $520.69 per week, until such time as he returns to work or until further Order of the Commission.
4. Plaintiff is hereby awarded $37,868.80 plus a ten percent penalty of $3,786.88, for a total of $41,637.60 as compensation for his PPD rating of forty percent (40%) to the right hand as of the date of maximum medical improvement of December 11, 2007. Payment of this award shall be deferred until such time as plaintiff returns to gainful employment. At that time, if defendants have made payments in excess of the $41,637.60 which plaintiff is entitled to receive for his PPD rating, defendants shall receive a credit for all amounts paid as TTD up to that amount. If TTD payments subsequent to maximum medical improvement exceed $41,637.60, then plaintiff shall be entitled to no additional compensation for permanent partial disability.
5. Defendants shall pay the cost.
This the 23rd day of April 2009.
S/___________________ *Page 9 
 STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER
 *Page 1